**FILED**
Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By Carrie Ramirez at 12:59 pm, Sep 05, 2008

# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

In the matter of:         )

                               )          Chapter 7 Case

JANICE E. BANKS JAMES     )

                               )          Number 07-40455

            *Debtor*       )

## MEMORANDUM AND ORDER
## ON MOTION OF THE UNITED STATES TRUSTEE
## TO DISMISS PURSUANT TO § 707(b)

### FINDINGS OF FACT

Debtor's case was filed on March 28, 2007. On June 25, 2007, the United States Trustee filed a Motion to Dismiss. The United States Trustee argues that Debtor's Chapter 7 case constitutes an abuse of provisions of Chapter 7, contending that an unrebutted presumption of abuse arises under § 707(b)(2)(A)(i) or abuse has been shown under § 707(b)(3)(B) and its totality of circumstances test. Following discovery, the parties entered into a lengthy stipulation which is incorporated herein *verbatim*.

1.     On December 14, 1999, the debtor obtained a disaster relief loan from the U.S. Small Business Administration ("SBA") in the amount of $109,500.00. The proceeds of the loan were used to repair flood damage to the debtor's home at 217 Wesley Street in Savannah. Since ABN Amro Mortgage held the first position mortgage against the 217 Wesley Street property, the SBA took a second position mortgage against it.

2.     In the years after the SBA loan proceeds were used to repair the house on 217 Wesley Street, additional flood damage occurred on the premises which ultimately rendered the home uninhabitable.

3.  In October 2006, the debtor abandoned her home at 217 Wesley Street. At that time, she moved into a house at 119 Alpine Drive in Savannah that is owned by her estranged husband. Around the same time, the debtor ceased making mortgage payments to ABN Amro Mortgage and the SBA. Prior to the petition date in this case, the SBA accelerated the loan obligation that was owed by the debtor.

4.  With respect to the house where she now lives (119 Alpine Drive), the debtor does not pay any rent to her estranged husband, does not make the monthly mortgage payment, does not pay for homeowner's insurance, and does not pay the real estate taxes. The debtor currently has no plans to move out of the house at 119 Alpine Drive.

5.  On March 21, 2008, the SBA issued a letter to the debtor advising that the SBA intended to garnish the debtor's wages in 60 days if she did not pay the outstanding balance owed to the SBA in full. *See* Exhibit A (the SBA letter).

6.  The debtor filed a voluntary chapter 7 bankruptcy petition on March 28, 2008. Along with her petition, the debtor filed, *inter alia*, bankruptcy schedules, a statement of financial affairs, a statement of intention, and a Chapter 7 Statement of Current Monthly Income and Means-Test Calculation (the "Means Test Form"). *See* Exhibit B (petition and related filings).

7.  The debtor filed an amended Means Test Form on May 14, 2007. *See* Exhibit C (amended means test form).

8.  Shortly following the petition date, the debtor's vehicle, a 1998 Ford Contour, broke down and was no longer driveable.

9.  The debtor's estranged husband, who lives in a suburb of Atlanta, purchased a new 2007 Ford Fusion for the debtor to drive. The debtor's husband is the title owner of the vehicle, but the debtor agreed to make all the payments on it. The purchase contract requires payments of $526.79 per month for 60 months beginning May 7, 2007. *See* Exhibit D (vehicle purchase contract for the Ford Fusion).

10. The debtor and her estranged husband are living apart for reasons other than to evade the requirements of § 707(b)(2)(A) of the Bankruptcy Code. The debtor and her husband have been living apart from one another since the mid-1990's.

11. In November 2007, the debtor suffered a serious gastrointestinal illness which required surgery. She has since gone back to work full time at the U. S. Postal Service.

12. The debtor is 51 years old and has worked at the U. S. Postal Service for 32 years.

The debtor earned $50,457.36 in gross wages during calendar year 2007 and has no dependents. The debtor and her estranged husband keep their own separate bank accounts and do not commingle their funds. The debtor's estranged husband pays for all of his own separate living expenses without contribution from the debtor. The debtor has a household size of one person for means test purposes.

13.   The debts at issue in this case are primarily consumer debts.

14.   Shortly after the petition date, ABN Amro Mortgage obtained relief from the automatic stay and foreclosed on the property at 217 Wesley Street.

15.   The SBA filed a timely proof of claim on October 29, 2007, asserting a claim in the amount of $97,987.58 secured by the debtor's real property at 217 Wesley Street. *See* Exhibit E (SBA's original proof of claim).

16.   On February 8, 2008, the debtor filed an objection to the SBA's proof of claim. *See* Exhibit F (debtor's objection).

17.   On March 4, 2008, the SBA filed an amended proof of claim, modifying its claim from secured to unsecured status. *See* Exhibit G (SBA's amended proof of claim).

18.   On March 10, 2008, the SBA filed a response to the debtor's objection. *See* Exhibit H (SBA's response to debtor's objection). The Court scheduled a hearing on the objection for April 8, 2008.

19.   On March 28, 2008, the debtor withdrew her objection to the SBA's amended proof of claim. The SBA's amended proof of claim is an allowed unsecured claim in this case.

20.   Attached hereto as Exhibit I is a spreadsheet showing both the debtor's and the UST's means test analysis. The spreadsheet illustrates the line entries that the parties assert to be correct on the means test form at two different points in time: (a) the petition date, and (b) April 30, 2008 – the date set for the evidentiary hearing in this matter. The parties agree that the numbers appearing on the spreadsheet are accurate. The issues in dispute as to the means test are (1) whether the debtor is entitled to the IRS standard deduction for a mortgage/rent expense on Line 20B of the means test form, and (2) whether the debtor is entitled to deduct certain future payments on secured claims on Lines 42 and 43 of the means test form.

21.   Attached hereto as Exhibit J are stipulated Schedules I and J showing the debtor's income and expenses as of the petition date. The parties agree that the numbers appearing on these schedules are accurate.

22.    Attached hereto as <u>Exhibit K</u> are stipulated Schedules I and J showing the debtor's income and expenses as of April 30, 2008. The parties agree that the numbers appearing on these schedules are accurate.

In her Means Test calculation, Debtor claimed two deductions that the United States Trustee disputes. First, Debtor claimed a Local Standard expense deduction under 11 U.S.C. § 707(b)(2)(A)(ii)(I) for "mortgage/rent" in the amount of $693.00 on Line 20B of the Form B22A of her means test form. Second, Debtor claimed a $2,033.50 secured debt deduction on the 217 Wesley Street property on Lines 42 and 43. The issues are (1) whether Debtor is entitled to the IRS standard deduction for a mortgage/rent expense on Line 20B even if she does not actually make a mortgage or rent payment; and (2) whether Debtor is entitled to deduct certain future payments on secured claims on Lines 42 and 43 for payments on collateral that she intended to surrender at the time of filing the petition.

Debtor argues that the plain language of the statute does not require a debtor to reaffirm the secured debt in order to deduct the payment. On the petition date, the payments on the surrendered collateral were "scheduled as contractually due" to the secured creditor in some or all of the sixty months following the petition date. Debtor urges this Court to hold that as long as she was contractually obligated at the petition date to make these payments in some or all of the sixty months subsequent to the petition date, she is allowed to deduct the average of those payments in Lines 42 and 43 of the means test form. <u>Debtor's Brief,</u> Dckt. No. 67 (June 19, 2008).

The United States Trustee argues that "because the debtor (1) abandoned that home to live elsewhere approximately five months prior to filing her bankruptcy petition, (2) ceased making payments to the secured creditors when she moved out, and (3) filed a statement of intent disclosing that she intends to surrender her home," the mortgage debt should not be considered "scheduled as contractually due" on her bankruptcy petition's schedules or otherwise, over the subsequent 60-month period after the date of her petition. United States Trustee's Reply Brief, Dckt.No. 71 (July 21, 2008).

## CONCLUSIONS OF LAW

### I. Presumption of Abuse under § 707(b)(2)

Section 707(b)(2)(A) states that this Court shall presume that a debtor's case is an abuse of Chapter 7 if the debtor's current monthly income, less the amounts deductible under § 707(b)(2)(A)(ii)(iii), and (iv), over a 60-month period, equals or exceeds $167.00 ($10,000 / 60).[1]  Debtor's Amended Form B22A shows that her monthly income is $5,275.00 and her monthly deductions total $8,625.56.  That negative number falls well below the $10,000.00 threshold. If the deductions claimed by Debtor are disallowed, the presumption of abuse will arise.

However, only the second issue, whether the $2,033.50 secured debt deduction on the 217 Wesley Street property on Lines 42 and 43 should be allowed, is

---

[1]  For cases filed after April 1, 2007, the threshold increases to $10,950.00.

dispositive of whether the presumption of abuse arises in this case. Regardless of whether this Court allows the deduction of $693.00 on Line 20B, the presumption will or will not arise solely based on whether this Court allows the secured debt deduction on the 217 Wesley Street property.

The United States Trustee focuses on §707(b)(2)(A)(iii) which provides:

> The debtor's average monthly payments on account of secured debts shall be calculated as the sum of -
>
> (I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
>
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under Chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
>
> divided by 60.

The issue revolves around the construction of the words "scheduled as contractually due." There is a split of authority as to whether payments on property that have been or will be surrendered after the petition date may be included in calculating a debtor's average monthly payments on account of secured debts. The vast majority of courts hold that §707(b)(2)(A)(iii)(I) permits a debtor to claim a deduction for payments on debts secured by

property that the debtor intends to surrender.[2] The minority of courts focus on the term "scheduled" in § 707(b)(2)(A)(iii)(I) and hold it has a bankruptcy-specific meaning which refers to how the debt is listed in a debtor's schedules and statements.[3] Thus, if Debtor states an intent to surrender collateral on the Statement of Intention, then the minority view finds the debt to not be "scheduled as contractually due" and holds Debtor cannot deduct the payment on that debt in the means test. I agree with the majority of courts and hold that Debtor is allowed to claim a deduction for payments on the debt secured by the 217 Wesley Street property even though Debtor intended to surrender that property at the time of the petition.

To determine the amount that may be deducted from CMI, "we must begin with the language of the statute itself." In re T.H. Orlando, Ltd., 391 F.3d 1287, 1291 (11th

---

[2] See, e.g., In re Randle, slip op., 2007 WL 2668727, at *10 (N.D.Ill. July 20, 2007); In re Degrosseilliers, slip. op., 2008 WL 2725808, at *3 (Bankr.E.D.Va. July 11, 2008); In re Quigley, 391 B.R. 294, 298 (Bankr.N.D.W.Va. 2008); In re Smale, 390 B.R. 111, 120 (Bankr.D.Del. 2008); In re Anderson, 383 B.R. 699, 707 (Bankr.S.D.Ohio 2008); In re Burmeister, 378 B.R. 227, 230-31 (Bankr.N.D. Ill. 2007); In re Chang, slip op., 2007 WL 3034679, at *3 (Bankr.N.D.Cal. October 16, 2007); In re Hayes, 376 B.R. 55, 66 (Bankr.D.Mass. 2007); In re Kelvie, 372 B.R. 56, 62 (Bankr.D.Idaho 2007); In re Kogler, 368 B.R. 785, 791 (Bankr.W.D.Wis. 2007); In re Zak, 361 B.R. 481, 487 (Bankr.N.D.Ohio 2007); In re Longo, 364 B.R. 161, 165 (Bankr.D.Conn. 2007); In re Mundy, 363 B.R. 407, 408-09 (Bankr.M.D.Pa. 2007); In re Sorrell, 359 B.R. 167, 187 (Bankr.S.D.Ohio 2007); In re Hartwick, 359 B.R. 16, 22 (Bankr.D.N.H. 2007); In re Glayton, 366 B.R. 164, 170 (Bankr.W.D.Okla. 2007); In re Wilkins, 370 B.R. 815, 820 (Bankr.C.D.Cal. 2007); In re Ellringer, 370 B.R. 905, 913 (Bankr.D.Minn. 2007); In re Maya, 374 B.R. 750, 752-53 (Bankr.S.D.Cal. 2007); In re Makres, 380 B.R. 30, 36 (Bankr.N.D.Okla. 2007); In re Grahm, 363 B.R. 844, 849 (Bankr.S.D.Ohio 2007); In re Benedetti, 372 B.R. 90, 95 (Bankr.S.D.Fla. 2007); In re Osborne, 374 B.R. 68, 70 (Bankr.W.D.N.Y. 2007); In re Lindstrom, 381 B.R. 303, 307 (Bankr.D.Colo. 2007); In re Haar, 360 B.R. 759, 760 (Bankr.N.D.Ohio 2007); In re Nockerts, 357 B.R. 497, 503 (Bankr.E.D.Wis. 2006); In re Walker, slip op., 2006 WL 1314125, at *8 (Bankr.N.D.Ga. 2006); In re Simmons, 357 B.R. 480, 485-86 (Bankr.N.D.Ohio 2006); In re Fowler, 349 B.R. 414, 417-18 (Bankr.D.Del. 2006); In re Hartwick, 352 B.R. 867 (Bankr.D.Minn. 2006), aff'd 373 B.R. 645 (D.Minn. 2007)

[3] See e.g., In re Suess, 387 B.R. 243, 246 (Bankr.W.D.Mo.2008); In re Coleman, 382 B.R. 759, 763 (Bankr.W.D.Ark. 2008); In re Naut, slip op., 2008 WL 191297, at *7-9 (Bankr.E.D.Pa. January 22, 2008); In re Burden, 380 B.R. 194, 201 (Bankr.W.D.Mo. 2007); In re Ray, 362 B.R. 680, 683-85 (Bankr.D.S.C. 2007); In re Masur, slip op., 2007 WL 3231725, at *3-4 (Bankr.D.S.D. October 30, 2007); In re Skaggs, 349 B.R. 594, 597-600 (Bankr.E.D.Mo. 2006); In re Harris, 353 B.R. 304, 309 (Bankr.E.D.Okla. 2006); In re Love, 350 B.R. 611, 614-15 (Bankr.M.D.Ala. 2006).

Cir. 2004)." The plain meaning of the statute is conclusive "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." In re Paschen, 296 F.3d 1203, 1207 (11th Cir. 2002)(*quoting* U.S. v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). Since "scheduled as contractually due" has not been expressly defined by the Bankruptcy Code, "we are to give that language its common meaning." In re Fretz, 244 F.3d 1323, 1327 (11th Cir. 2001).

In construing the words "contractually due," the Northern District of Georgia stated "[t]he common meaning of 'contractually due' is that the debtor is legally obligated under the contract . . . to make a payment in a certain amount, with a certain amount of interest, for a set number of months into the future." In re Walker, slip op. 2006 WL 1314125, at *3 (Bankr. N.D.Ga., May 1, 2006). There is no dispute that Debtor was still contractually obligated to make the payments on the 217 Wesley Street property at the time of the means test form was filed by Debtor. "At the time of filing the petition, Debtor's 'rights and duties under an otherwise enforceable prepetition contract remain, notwithstanding the collateral's surrender.'" In re Randle, 2007 WL 2668727, at *7 (N.D.Ill., July 20, 2007)(*quoting* In re Haar, 360 B.R. 759, 764 (Bankr.N.D.Ohio 2007)). Debtor's intent to surrender the property does not affect the contractual obligations owed by Debtor. "The 'Statement of Intention' filed at the time of the petition is not a self-executing document, that when filed automatically extinguishes a contract; rather it is, as titled, a statement of intention to surrender in the future." Id. (*citing* In re Longo, 364 B.R. 161, 166

AO 72A
(Rev. 8/82)

(Bankr.D.Conn., 2007)).

Since Debtor's obligation is "contractually due" upon the filing of the petition, the next issue is "whether the language immediately precedent, 'scheduled as,' is to be accorded its dictionary meaning or whether this term is to be defined by reference to its common bankruptcy usage" where Debtor's schedules and statements are to be used by this Court to determine whether Debtor's debt is "scheduled as contractually due.'" In re Haar, 260 B.R. at 764; see In re Singletary, 354 B.R. 455, 468 (Bankr. S.D.Tex., 2006). Most courts adopt the dictionary interpretation of "scheduled" which means "to plan for a certain date." If at the time of the petition the secured debt is still contractually due and the payments on the debt are scheduled to be made at a future date, irregardless of intention to later surrender the property, the majority of courts find these payments are "scheduled as contractually due." See In re Walker, 2006 WL 1314125, at *3. A minority of courts adopt the bankruptcy usage of "scheduled" and look at the schedules and statements. Thus, if the statement of intention states a debtor will surrender the property, these courts hold that the debt is not "scheduled as contractually due." See In re Skaggs, 349 B.R. 594, 599 (Bankr. E.D. Mo., 2006); In re Harris, 353 B.R. 304, 309 (Bankr. E.D. Okla., 2006). I adopt the majority approach for the following reasons.

An analysis of other statutory provisions that use the phrase "scheduled" compels this Court to conclude that "scheduled as" in §707(b)(2)(A)(iii) does not refer to the bankruptcy schedules and statements. As the Bankruptcy Court of the Eastern District of

Wisconsin explained:

> although the Bankruptcy Code uses the phrase "scheduled as contractually due" only once (in § 707(b)(2)(A)(iii)), it also uses the phrase "scheduled as" only one time - in § 1111(a), which provides: "A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that *appears in the schedules* filed under section 521(1) or 1106(a)(2) of this title, except a claim or interest that is *scheduled as* disputed, contingent, or unliquidated." (Emphasis added). While it is readily apparent from the highlighted terms and the context of the section that §1111(a) is referring to the bankruptcy schedules, there is no similar reference or apparent context in § 707(b)(2)(A)(iii). Broadening the review to include the Bankruptcy Code's references to a claim or debt being "scheduled" turns up two provisions that obviously mean "listed on the bankruptcy schedules" §523(a)(3) (discharge of a debt that is "neither listed nor scheduled under section 521(1)"); and § 554(c) (deemed abandonment of property "scheduled under section 521(1)"), and two provisions that equally obviously do not: § 524(k)(3)(H)(ii) (suggested reaffirmation agreement language "describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party"; and § 1326(a)(1)(B) (debtor shall make pre-confirmation payments "scheduled in a lease of personal property directly to the lessor"). [In conclusion], when describing the bankruptcy schedules, Congress included in the statute a reference to the schedules, either directly by name or indirectly by reference to §521, the provision that requires the debtor to file bankruptcy schedules. On the other hand, when the statute refers to scheduled payments, such as in the reaffirmation or reconfirmation lease provision, the bankruptcy schedules are not mentioned.

In re Nockerts, 357 B.R. 497, 502-03 (Bankr. E.D.Wis., 2006); *see also* In re Randle, 2007

WL 2668727, at *6; In re Rudler, 388 B.R. 433, 438 (1st Cir.B.A.P. 2008); In re Van

Bodegom Smith, 383 B.R. 441, 449 (Bankr.E.D.Wis., 2008); In re Allen, slip op., 2008 WL

451053, at *5 (Bankr.D.Kan. Feb. 15, 2008); In re Hayes, 376 B.R. 55, 61 (Bankr.D.Mass.

2007); In re Makres, 380 B.R. 30, 34 (Bankr.N.D.Okla. 2007); In re Mundy, 363 B.R. 407,

411 (Bankr.M.D.Pa. 2007); In re Galyon, 366 B.R. 164, 167 (Bankr. W.D. Okla., 2007).

Additionally, "[a] contextual analysis of § 707(b)(2)(A)(iii)(I) supports the

interpretation of the statute set forth above." In re Mundy, 363 B.R. at 413.[4]  First, looking

specifically at § 707(b)(2), "interpreting § 707(b)(2)(A)(iii)(I) as providing for a "snapshot"

of a debtor's liabilities as of the petition date is consistent with the preceding subparagraph

. . . which states that '[t]he debtor's monthly expenses shall be the debtor's applicable

monthly expense amounts specified under the National and Local Standards . . . as in effect

on the date of the order for relief." In re Quigley, 391 B.R. 294, 303 (Bankr.N.D.W.Va.

---

[4] The United States Trustee argues that interpreting § 707(b)(2)(A)(iii)(I) in context with § 707(b)(2)(A)(iii)(II) supports the minority's position. Section 707(b)(2)(A)(iii)(II) provides that the calculation of a debtor's secured debt payment expense includes

> any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts.

I disagree with the United States Trustee. This provision supports the majority position because if Congress wished in "§ 707(b)(2)(A)(iii)(I) to limit which secured debts could be deducted from a debtor's 'current monthly income' it could have qualified the language used as it did in subsection (II) of that same statutory provision which permits the deduction of 'additional payments due to secured creditors' only if such payments for certain collateral that is 'necessary for the support of the debtor and the debtor's dependents." In re Simmons, 357 B.R. 480, 485 (Bankr.N.D.Ohio 2006). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. U.S., 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). "Congress's failure to likewise limit subclause (I) [like subclause (II)]... supports the conclusion that all scheduled secured debt payments are included in subclause (I) . . . " In re Palm, slip op., 2007 WL 1772174, at * 3 (Bankr.D.Kan. June 19, 2007); see also In re Hays, slip op., 2008 WL 1924233, at *4-6 (Bankr.D. Kan. April 29, 2008); In re Haar, 360 B.R. 759, 767 (Bankr.N.D. Ohio 2007).

2008). Most of the expense deductions allowed to debtors in § 707(b)(2) are not based on a debtor's actual expenses; instead, debtors are only allowed to deduct standard expenses set by the Internal Revenue Service National and Local Standards. *See* In re Hayes, 376 B.R. at 65; In re Randle, 358 B.R. 360, 364 (Bankr. N.D. Ill., 2006); In re Walker, 2006 WL 1314125 at *7. "Therefore, within the context of this mechanical formula in which deductible expense amounts may not reflect a debtor's actual expenditures, it is not inconsistent to include secured debt for property that a debtor intends to surrender..." In re Mundy, 363 B.R. at 413.

Second, § 707(b)(2)'s relationship with § 707(b)(3) further bolsters this Court's interpretation that the term "scheduled" does not connote a bankruptcy definition of schedules and statements. As I previously held:

> "'Congress' intent in adding the Means Test was to create a 'mechanical' formula for presuming abuse of Chapter 7.'" "Congress' intent to use a standardized or mechanical test and avoid reliance on individualized information as much as possible is demonstrated throughout § 707(b)(2)." The major objective of Congress in adding the means test in § 707(b)(2) was to limit judicial discretion from the process of determining abuse by providing an objective standard for establishing a presumption of abuse. However, Congress did not remove the ability of bankruptcy courts to consider circumstances, including postpetition developments, in determining abuse. On the contrary, Congress expressly incorporated the formerly judicially created totality of the circumstances test [of § 707(b)(3)] which permits consideration of circumstances both preceding and following the filing of the petition.

> In re Cribbs, 387 B.R. 324, 332 (Bankr.S.D.Ga.
> 2008)(Davis, J.)(*quoting* In re Haman, 366 B.R. 307, 317
> (Bankr.D.Del. 2007)(*citing* In re Harwick, 352 B.R. 867,
> 870 (Bankr.D.Minn. 2006)))(internal citations omitted).

Therefore, "[t]o allow a movant to include future events as part of the means test would eliminate the distinction between the presumption of abuse test and the totality of circumstances test." In re Hartwick, 359 B.R. 16, 21-22 (Bankr.D.N.H. 2007). As a result, "a debtor's decision to surrender collateral securing a debt, while it may be a factor when analyzing abuse under the totality of circumstances test under § 707(b)(3), may not be considered under the plain language of § 707(b)(2)(A)(iii)(I)." In re Mundy, 363 B.R. at 414.[5]

In conclusion, § 707(b)(2)(A)(iii)(I) is clear, for purposes of the means test

---

[5] Relying on In re Burden, 380 B.R. 194 (Bankr.W.D.Mo. 2007), the United States Trustee argues that disallowing this deduction is actually consistent with the "snapshot" view adopted by the majority because: (1) it had "no problem binding debtors" to their statements of intent to surrender collateral; (2) the statement of intent is required to be filed quickly enough to be "captured in a 'snapshot'"; and (3) like the majority position, the minority position is not dependent on the future conduct of the debtor. Id. at 203.

I disagree. First, "[a]s the title of the document suggests, a declaration made on the Statement of Intention is not immediately binding and does not mean that the collateral as already been surrendered. Rather, it is merely a declaration of an intent to surrender the collateral in the future which can be amended by the debtor for 30 days after the first meeting of creditors." In re Singletary, 354 B.R. 455, 467 (Bankr.S.D.Tex. 2006)(*citing* Fed. R. Bankr.P. 1009(b); 11 U.S.C. § 521(a)(2)(B)). Since the statement of intention is not binding on Debtor at the time of the petition, the minority's position is in fact dependent on whether Debtor acts on or amends his statement of intention.

Second, the means test intends to capture a "snapshot" of the debtor's financial state as of the date the petition. The means test is based entirely on debtor's historical income figures. Section 101(10A) clearly indicates that the term current monthly income is the average of the debtor's income for the six months *preceding* the date of the petition. Neither the plain language of § 707(b) nor the definition found in § 101(10A) provide any extra time to determine the calculation of the current monthly income.

and on Form 22A, that debtors may deduct payments to their secured creditors that are required under contract to be paid in each of the sixty months after the date the petition is filed, regardless of whether the payments will actually be made, whether the debtor will retain the collateral, or whether the debtor will eventually surrender the property to the secured creditor.

## II.  Totality of Circumstances

The United States Trustee has alternatively asked this Court to dismiss Debtor's Chapter 7 under 11 U.S.C. § 707(b)(3)(B), arguing that the granting of relief would be an abuse of the provisions of Chapter 7 given the totality of the circumstances of Debtor's financial situation. That section states:

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(I) of such paragraph does not arise or is rebutted, the court shall consider-
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of circumstances . . . of the debtor's financial situation demonstrates abuse.
>
> 11 U.S.C. § 707(b)(3).

Since the presumption did not arise, the United States Trustee bears the burden of proving that a totality of circumstances of the debtor's financial situation demonstrates "abuse." In

re Cribbs, 387 B.R. at 332. The United States Trustee first asks this Court to find that if he demonstrates that Debtor has the ability to pay any of her debts in a hypothetical Chapter 13, he has satisfied his burden and the Court should dismiss the case for abuse. Second, if the United States Trustee must show more than ability to pay, he argues that additional facts support a finding of abuse.

The United States Trustee asks this Court to reconsider the holding in In re Cribbs, 387 B.R. 324 (Bankr.S.D.Ga. 2008) and hold that Debtor's ability to pay her debts in a hypothetical Chapter 13 is a sufficient basis for granting dismissal under §707(b)(3)(B). The United States Trustee's argues "pre-BAPCPA case law in this jurisdiction [and In re Green, 934 F.2d 568 (4th Cir. 1991), the view which In re Cribbs adopts,] has been legislatively abrogated by the BAPCPA amendments to § 707(b) and does not reflect the appropriate legal standard to be applied in determining abuse pursuant to § 707(b)(3)(B)." United States Trustee's Reply Brief, Dckt.No. 71, pg. 21. He relies on legislative history to support his argument:

> The new section 707(b) also provides that in addition to the means test, Chapter 7 debtors' cases may be dismissed if the filing is not in good faith or the "totality of the circumstances" indicate that granting relief under Chapter 7 would constitute abuse. No inference should be drawn, however that by referencing the "totality of the circumstances" Congress intended to approve the result in In re Green, 934 F.2d 568 (4th Cir. 1991) or similar cases. Such cases are rejected by the means test reforms and the change in the standard from "substantial abuse" to "abuse" in HR 2415.

United States Trustee's Reply Brief, Dckt.No. 71, pg. 19
(*quoting* 146 Cong.Rec. S11683, S11700 (Dec. 7, 2000)).

This reliance on legislative history is misguided. The Supreme Court has

found legislative history to be unreliable and should only be considered when a word in a

statute is ambiguous.[6]  As the Court stated,

> legislative history in particular is vulnerable to two serious
> criticisms. First, legislative history is itself often murky,
> ambiguous, and contradictory. Judicial investigation of
> legislative history has a tendency to become, to borrow
> Judge Leventhal's memorable phrase, an exercise in
> "looking over a crowd and picking out your friends."
> Second, judicial reliance on legislative materials like
> committee reports, which are not themselves subject to the
> requirements of Article I, may give unrepresentative
> committee members - or, worse yet, unelected staffers and
> lobbyists - both the power and the incentive to attempt
> strategic manipulations of legislative history to secure
> results they were unable to achieve through the statutory
> text.
>
> Exxon Mobil Corp. v. Allapattah Svcs., Inc., 545 U.S. 546,
> 568-69, 125 S.Ct. 2611, 2626, 162 L.Ed. 2d 502 (2005).

---

[6]As Justice Scalia stated in Blanchard v. Bergeron,

That the Court should refer to the citation of three District Court cases in a document issued by a single committee of a single house as an action of *Congress* displays the level of unreality that our unrestrained use of legislative history has attained... As anyone familiar with modern-day drafting of a congressional committee report is well aware, the references to the cases were inserted, at best by a committee staff member on his or her own initiative, and at worst by a committee staff member at the suggestion of a lawyer-lobbyist; and the purpose of those references was not primarily to inform the Members of Congress what the bill meant... but rather to influence judicial construction. What a heady feeling it must be for a young staffer, to know that his or her citation of obscure district court cases can transform them into the law of the land, thereafter dutifully to be observed by the Supreme Court itself.

489 U.S. 87, 98-99, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989)(Scalia, J., concurring).

Moreover, the legislative history quoted by the United States Trustee is more unreliable than most. As the United States Trustee acknowledges, this "history" pertains to an earlier draft of BAPCPA that was never adopted. The Southern District of Ohio explained that this history "is of dubious assistance" since "the history of the [earlier] legislative efforts culminating in the 2005 Act is not the same as the legislative history of the 2005 Act." In re Sorrell, 359 B.R. 167, 176 (Bankr.S.D.Ohio 2007). Because this history is unreliable and I do not consider any of § 707(b)(3)(B) to be ambiguous, I find nothing persuasive to cause a reconsideration of In re Cribbs.

I reaffirm my holding in In re Cribbs and find that in order to prove a totality of the circumstances of a debtor's financial condition demonstrates abuse, the United States Trustee must show more than a debtor's ability to fund a Chapter 13 plan.  Since §707(b)(3) incorporates the judicially constructed tests of bad faith and totality of circumstances, it is appropriate to apply pre-BAPCPA concepts for determining "abuse" under the current §707(b)(3). In re Cribbs, 387 B.R. at 333; see In re Hickman, slip op., 2008 WL 2595182, at *5 (Bankr.W.D.Wash., June 27, 2008)("courts that conducted [the analysis under §707(b)(3)(B)] have recognized that § 707(b)(3) is 'best understood as a codification of pre-BAPCPA case law and as such, pre-BAPCPA case law is still applicable when determining whether to dismiss a case for abuse.'"); see also In re Wolf, 390 B.R 825, 830-31 (Bankr.D.S.C. 2008);  In re Walker, 383 B.R. 830, 836 (Bankr.N.D.Ga. 2008).

Pre-BAPCPA authority in this District established that the United States

Trustee must show more than merely Debtors' ability to fund a Chapter 13 plan. *See* In re Ackerberg, 1998 WL 34066298, at *2-3 (Bankr.S.D.Ga., Jan. 26, 1998)(Davis, J.); In re Rowell, 1992 WL 12004006, at *4 (Bankr.S.D.Ga. Dec. 16, 1992)(Davis, J.); In re Elliston, 1991 WL 11002685, at *4-5 (Bankr.S.D.Ga., July 15, 1991)(Davis, J.).

This approach is widely shared among bankruptcy courts in this circuit. *See e.g.*, In re Walker, 383 B.R. at 837-38 (Drake, J.)(finding abuse because debtors had reordered their priorities in order to subsidize their adult children's college expenses and living expenses.); In re Rollins, slip op., 2007 WL 2106087, at *5 (Bankr.M.D.Ga., July 16, 2007)(Hershner, J.); In re Johnson, 318 B.R. 907, 916-17 (Bankr.N.D.Ga.2005)(Mullins, J.)("[T]he Debtor's ability to pay as measured by what could be paid in a hypothetical chapter 13 case is not the conclusive factor."); In re O'Conner, 334 B.R. 462, 466 (Bankr.N.D.Fla.2005)(Killian, J.); In re Lee, 162 B.R. 31, 37 (Bankr.N.D.Ga.1993)(Murphy, J.)("Analyzing the totality of the circumstances to determine whether Debtors' petition represents a substantial abuse is appropriate."); In re Rogers, 168 B.R. 806, 808 (Bankr.M.D.Ga.1993)(Laney, J.)("This court will stop short, however, of adopting the position that the ability to repay debts through a Chapter 13 plan is the only determining factor. Substantial abuse should be determined on a case-by-case basis after considering the totality of the circumstances."); In re Tefertiller, 104 B.R. 513, 516-17 (Bankr.N.D. Ga.1989)(Drake, J.).

"[T]he sheer mathematical ability to fund a chapter 13 plan can, and

properly should, be considered and weighed as one, but only one, factor within a totality of the circumstances analysis." To artificially limit this Court's examination of the debtor's financial condition to one factor "is at odds with the totality of circumstances inquiry mandated by Congress . . . " In re Beckerman, 381 B.R. 841, 845 (Bankr.E.D.Mich. 2008). Therefore, even though the primary factor is whether a debtor has the ability to repay a meaningful portion of his debts from future income, the United States Trustee must prove more:

> (1) Whether the bankruptcy filing was precipitated by an unforseen or sudden calamity, such as an illness or unemployment;

> (2) Whether the debtor is eligible for chapter 13 relief;

> (3) Whether the debtor has made any efforts to repay his debts or negotiate with creditors; whether there are non-bankruptcy remedies available to the debtor; or whether the debtor can obtain relief through private negotiations.

> (4) Whether the debtors could provide a "meaningful" distribution in a chapter 13 case;

> (5) Whether the debtor's expenses could be reduced significantly without depriving them and their dependents of necessities, including whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and

> (6) the period of time over which the debts were incurred.

> In re Cribbs, 387 B.R. at 335.

To this non-exclusive list of factors, I add a seventh factor: whether the debtor has a stable

source of future income. *See* In re Behlke, 358 F.3d 429, 437 (6th Cir. 2004); In re Krohn, 886 F.2d 123, 126-27 (6th Cir. 1989); In re Walker, 383 B.R. at 837. Because determining ability to pay depends on projecting future income, a snapshot of current income is insufficient. Rather, the long-term reliability of that source of income is an important factor.

To determine whether Debtor can provide a "meaningful" distribution in a hypothetical Chapter 13, courts consider the debtor's schedules, statements, and any other facts that are necessary for this analysis. *See* In re Lipford, slip op. 2008 WL 1782640, at *4 (Bankr.M.D.N.C., April 17, 2008); In re Wadsworth, 383 B.R. 330, 335 (Bankr.N.D.Ohio 2007); In re Short, slip op., 2008 WL 2020200, at *3 (Bankr.D.Neb, May 8, 2008).

There is no bright-line rule establishing what is "meaningful." *See* In re Behlke, 358 F.3d at 439. Rather a court should consider both the percentage of unsecured debt a debtor is capable of paying as well as the dollar amount payable to any particular creditor or class.

Still, in a uniform national system of bankruptcy, there should be some objective component to this finding rather than a purely subjective judicial pronouncement. Nevertheless, seeking an objective standard is easier than finding one. In BAPCPA, Congress made certain policy judgments and crafted a formulaic framework for assessing whether a debtor is abusing the process based on its judgment of ability to pay debt. However imperfect that framework, it is a clear expression of legislative sentiment as to

"how much is enough." I agree that the abuse threshold fixed in § 707(b)(2)(A) is a helpful tool for determining whether a case should be dismissed for abuse under § 707(b)(3)(B). In re Mestemaker, 359 B.R. 849, 857-58 (Bankr.N.D. Ohio 2007). It assists courts in analyzing what is "meaningful" based on Debtors' projected future income from Schedules I and J.

However, as attractive an option as it might be to engraft that formula as an absolute "bright line" standard for what is "meaningful,"[7] I decline to do so. Congress could have, but did not place that formula in § (b)(3). Because Congress did not adopt the § (b)(2) standard in § (b)(3) but employed the term "totality of circumstances," I find that courts have been entrusted with discretion to assess ability to pay. We should pay close attention to the standard, but not become slave to it. While for purposes of § (b)(2) it evidences the legislative demarcation between a meaningful payment and a *de minimus* one and evidences a legislative demarcation between an effort which is only marginally productive and one which is not, it is not dispositive in the § (b)(3) context.

Under that standard, if a debtor's disposable monthly income is more than $167.00, the presumption of abuse always arises under § (b)(2), and it should matter to a court making a finding of what is "meaningful." Indeed, it may be "persuasive evidence that allowing the debtor to proceed under Chapter 7 would constitute an abuse" under (b)(3). In

---

[7] *See* In re Pennington, 348 B.R. 647, 651-52 (Bankr. D.Del. 2006); Wedoff, *Judicial Discretion to Find Abuse Under § 707)b)(3)*, 25 Am. Bankr. Inst. J., 1, 52 (April, 2005).

re Mondragon, slip op., 2007 WL 2461616, at *6 (Bankr.D.N.M., Aug. 24, 2007); *see also* In re Lipford, 2008 WL 1782640 at *3-4;  In re Mestemaker, 359 B.R. at 857.

In this case, I find that Debtor can make a meaningful distribution. As of the date of the hearing, the schedules showed disposable income of $400.44 per month, more than double the $167.00 threshold.[8]  It would yield approximately a 24.5% dividend to unsecured creditors, tantalizingly close to the alternative 25% threshold. In this case, unlike most, there is only one unsecured creditor, SBA, with a claim of $97,987.58. A 24.5% dividend on that claim equals $ 24,026.40. Neither 24.5% nor $24,026.40 nor $400.00 per month are insubstantial.

Having established the primary factor of "meaningful ability," the United States Trustee must still show more, and that showing has been made.  While this debt was occasioned by a flood, which is a sudden calamity and while Debtor's expenses cannot be reduced without a hardship to her, the United States Trustee is correct that this Chapter 7 is abusive.[9] Debtor is eligible for Chapter 13 and has significant disposable income.  As a thirty-two year employee of the United States Postal Service, she has above median, stable income and made no efforts to seek a non-bankruptcy remedy to deal with this debt. *See*

---

[8]  If a debtor's disposable income is over $167.00, the presumption always arises.  If a debtor's disposable income is at least $100.00, but less than $167.00, the presumption arises if debtor could pay a 25% dividend to creditors.

[9]  "BAPCPA removed the presumption in favor of granting the debtor relief and lowered the standard required for dismissal, from a showing of a 'substantial abubse' to a showing of an 'abuse'." In re Walker, 383 B.R. at 837.

Stipulation of Facts, Dckt.No. 66, Exhibit A. In light of these additional factors, I find that the totality of circumstances of Debtor's financial situation demonstrates abuse.

Debtor may seek a non-bankruptcy solution to this debt as invited by the SBA, or she may file a Chapter 13.  In a Chapter 13 case, Debtor would still receive substantial relief from her SBA debt.   Under state law, she owes a secured debt of $109,500.00 to SBA, which she would be forced to pay in full under state law. However, because her home became uninhabitable and was surrendered, the Code permits that debt to be paid as an unsecured debt, pro rata, since no collateral remains to secure the loan. Federal bankruptcy law will discharge her from this new unsecured debt to the extent that it exceeds her ability to pay. For her to simply walk away from the debt in its entirety, when she can pay $24,026.40 of the $97,987.58 claim or 24.5%, is abusive of the purposes and intent of bankruptcy to provide a "fresh start" and not a "head start."

Debtor offers no explanation for her desire to entirely avoid any repayment which negates the totality analysis.  Her home flooded, she borrowed funds to rehabilitate it, suffered another flood, and now expects to cast the burden of that loss entirely on the lender despite her above average income and her financial ability to share that loss by repaying what she can.  What she does not wish to do is exactly what the Code expects of her.

For the foregoing reasons, I hold that the totality of circumstances of

Debtor's financial position demonstrates abuse, thus I grant the United States Trustee's Motion to Dismiss.

# O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS THE ORDER OF THIS COURT that the case is dismissed unless Debtor converts her Chapter 7 to a voluntary Chapter 13 on or before September 22, 2008.

Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 4ᵗʰ day of September, 2008.